**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRISTAL VALJET, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  06-01842 |
| | : | |
| WAL-MART, | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM</u>**

BUCKWALTER, S. J.                                    December 11, 2007

  Currently pending before the Court is the Motion of Defendant Wal-Mart for

Summary Judgment against Plaintiff Cristal Valjet.  For the reasons set forth herein, the Motion

is granted in part and denied in part.

**I.  STATEMENT OF UNDISPUTED FACTS**[1]

  Plaintiff was first employed by Defendant in October of 2003 as an Assistant

Manager trainee.  (Valjet Dep. 28, 32, March 28, 2007).  She underwent assistant manager

training at the Franklin Mills Wal-Mart in Bucks County, Pennsylvania and completed it in late

February or early March 2004.  (<u>Id.</u> at 33, 59.)  Plaintiff then transferred to the store in

Cinnaminson, New Jersey to work as an assistant manager for a period of three and a half to four

weeks.  (<u>Id.</u> at 59-60.)  In April 2004, Plaintiff was assigned to work as an assistant manager in

Wal-Mart's South Philadelphia store.  (<u>Id.</u> at 61.)

---

1.  All of the facts are based solely on the March 28, 2007 deposition of Plaintiff Cristal Valjet.

On May 20, 2004, despite having the day off from work, Plaintiff came into the store at approximately 8:10 p.m. to prepare some paperwork for a manager meeting the following day.  (Id. at 70-71.)  She was sitting in front of a computer in the personnel department, when there was a call, at approximately 9:00 p.m., requesting a manager to clock-in the night employees.  (Id. at 77, 89.)  When she left the desk to respond to the call, her computer was on and her papers were sitting in individual folders next to the computer.  (Id. at 91-92).  Upon her return to the personnel office, however, her papers had been thrown on a table behind her and her computer was off.  (Id. at 92-93).  Plaintiff asked Mike, the maintenance supervisor, who rearranged her papers.  He did not know.  (Id. at 93).  She then turned to Merl Cordray, who was currently employed by Wal-Mart as a co-manager at the South Philadelphia store, and asked "why are my papers here?"  (Id. at 64-65, 93.)  He responded simply, "oh, I don't know.  Why would they be there?"  (Id. at 93.)  Mike, who had been interviewing prospective employees, then interjected and told Mr. Cordray that "somebody threw her papers on the table."  (Id. at 93.)

Plaintiff began picking up and trying to sort out her papers.  (Id. at 94.)  At that point, Mr. Cordray came over and said, "oh, is this my paper, what are you doing with this paper?"  (Id. at 94.)  She questioned him as to what paper he was referring, and he answered, "oh, don't worry, I have it."  (Id. at 97.)  Mike again intervened and told Mr. Cordray:  "hey, man, you saw, she's picking up her papers"; "What is this all about, man?"; "This sounds like a set-up"; "they threw her papers on there."  (Id. at 94-95.)   Mr. Cordray responded with "well, why does she have my papers?"  (Id. at 95.)  Mike then said "she didn't do anything, man, I've been here," and Mr. Cordray told him to stay out of it and to continue interviewing.  (Id. at 98.)  At that point,

Mike said, "I can't interview people here," and walked out saying, "I'm so sorry" to Plaintiff. (Id. at 94-95.)

Mr. Cordray then remarked, "we don't make this paper anymore. What are you doing with it?" (Id. at 95.) Plaintiff indicated to him that she did not know what paper he was talking about and asked to see the paper. (Id. at 95-96.) He replied, "what do you want to see the paper for? You know what paper it is." (Id. at 96.) When she repeated her request, he replied, "I don't have to show you nothing," and walked out with the paper. (Id. at 96, 97-98.) Although Plaintiff again denied knowledge of the basis for his statements, he did not respond. (Id. at 96-98.) Plaintiff testified that approximately six to seven people, including some prospective Wal-Mart employees, were present when Mr. Cordray made his accusations. (Id. at 94-95, 185.)

At approximately 11:45 p.m., Plaintiff was told by Mike that Theresa Ferm, the "people manager" at Wal-Mart's South Philadelphia Store, wanted Plaintiff to meet her in the manager's office. (Id. at 63, 102.) With just the two of them present, Ms. Ferm said to Plaintiff, "you have taken a paper that doesn't belong to you." (Id. at 103.) When Plaintiff said she did not know what paper Ms. Ferm was talking about, Ms. Ferm said, "Oh, they saw you." (Id. at 103.) A heated exchange ensued, and Ms. Ferm told Plaintiff she needed to go home. (Id. at 104.) Thereafter, Ms. Ferm called Mr. Cordray. The two spoke outside, and Mr. Cordray re-entered the office. (Id. at 104-105.) In Ms. Ferm's presence, he asked for Plaintiff's keys and told her to go home, which she did. (Id. at 106-107.) When Plaintiff asked if she was being fired, Mr. Cordray simply said that someone would call her in the morning. (Id. at 107-108.)

3

Two other assistant managers, Chaz Noah[2] and Hadiyah Muhammed, were waiting at customer service and observed Plaintiff leave right after her meeting.  (Id. at 100, 129.)

On May 24, 2004, plaintiff was asked to attend a closed-door meeting in the store manager's office with several members of Wal-Mart management.  (Id. at 124.)  Present at the meeting were Mr. Cordray, Bill Riif, who was the store manager, Chris Forster, who was a Wal-Mart district manager, and Ms. Ferm, who arrived ten minutes late.  (Id. at 124-125.)  Ms. Noah and Ms. Muhammed had been in the office immediately before the meeting started, but were told to leave by Mr. Riif.  (Id. at 125-126.)  Subsequently, Mr. Riif started the meeting and, as described by plaintiff, the following ensued:

> [He] said, Cristal, I gave you – I gave you a couple of days off, you know, to refresh. . . . I've spoken to Chris [Forster] on the investigation and I gave him my part, and I understand that you were – he said a word that I can't remember, but he said, a lot of the associates state that you didn't do anything wrong.  And then the other people that were not there are saying that – and I – he says, but let that go.  He says, I spoke to Chris [Forster] so – and I said, okay, thank you, Bill.  And he said, you know, you have really done a lot for this store and I – since my – I've been away I've seen how the departments look, and the associates really like you.  And I said, thank you.

(Id. at 129-130.)

At that point, Chris Forster interjected to speak because he had to go to a meeting.

(Id. at 130, 135.)  Plaintiff testified at her deposition that,

> A.   He said to me, Cristal, you have a choice.  Are you going to quit?  And I said, excuse me?  Bill Riif's eyes opened up.  He took off his glasses.  And he just said, Chris, what are we talking about here?  We didn't talk about that.  And Chris Forster said, are you

---

2.   Defendant refers to Chaz Noah as "Chaz Noakes."  For purposes of this Motion, the Court will accept Plaintiff's spelling of her name.

4

going to quit?  And he was like provoking me and harassing me.
And I said – I said, Chris, I don't know what you've been told but I
didn't do anything wrong.  And I – and – said this is the paper.
Isn't this the paper?  And I've said, I've never seen that paper in
my life.

Q.   Who said to you –

A.   Chris.

Q.   – is this the paper?

A.   Chris Forster.  He said, isn't this the paper?  He went like this,
isn't this the paper?  I said, I've never seen that paper in my life.  I
don't even know what that is.

(Id. at 130-131.)  After Plaintiff saw the paper in his hands, she stated, "boy, I've really been set

up now," since the paper shown to her by Mr. Forster was noticeably thinner than the pamphlet

Mr. Cordray initially accused her of taking.  (Id. at 133-134.)

Mr. Forster again asked if Plaintiff was going to quit.  According to Plaintiff's

deposition, the following events then occurred:

I said, you know what, I've been humiliated enough.  I says, you
have a nice day.  I said, Bill, thank you so much for being a great
manager.  I says, I have to take off.  I have to go and I have to see
my attorney, because I – I can't – I can't deal with this, the
humiliation.  He said, Cristal, please – I said, you've taken my keys
away.  I have counted millions of dollars in this store since I've
been here.  I have fixed mistakes in that cash office that you guys
couldn't find it, but I'm – that word "dishonest"?  I haven't taken
anything from anybody and I started crying.  And Chris said, what
are you going to do?  You're going to have a D-day then.  You're
going to have a D-day.  Are you going to quit?  Are you going to
quit?  Huh, huh?  And then when I said, I can't take this, Bill.  Bill
said, Cristal – he held my hand.  And he said, Cristal, just go home
and I'll call you later, okay? . . . And so I said, bye.  I said, have a
nice day.  And I walked out.  And he [Forster] said, don't let the
door hit you from behind.

5

(Id. at 137-138.)  Plaintiff testified that the word "dishonest" was used once in that meeting by

Mr. Cordray who, at the beginning of the meeting stated "it's dishonest to take . . ."  (Id. at 138.)

He was cut off, however, by Mr. Riif.  (Id.)

Plaintiff then explained that a decision day or D-day is where Wal-Mart sends an

employee home to make up his or her mind if he or she wants to come back to work.  (Id. at 139.)

D-days are not given unless an employee has "all kinds of insubordinations, like open doors and

write-ups, coachings."  (Id.)  Plaintiff testified that when Mr. Forster told her she was having a

D-day, Mr. Riif said, "Chris, no, no, no, no, no."  (Id. at 140.)  At that point, however, Plaintiff

said she was not going to take a decision day because she had not done anything wrong and had

been set up.  (Id.)  Plaintiff also informed Mr. Riif that someone in the store by the name of

Lloyd (who worked at the Cingular booth) told her that she was set up by Ms. Noah and Ms.

Muhammed and that he was willing to speak on her behalf.  (Id. at 140-141.)

In any event, Plaintiff left the meeting and started to walk out of the store.  (Id. at

147.)  As she walked through one of the two sets of doors exiting the store, she decided to hand

in her badge.  (Id. at 148).  When she turned around, she saw Mr. Cordray, Mr. Forster, Ms.

Ferm, Ms. Noah, Ms. Muhammed and Lloyd standing there.  (Id. at 148-149.)  As she went back

inside to hand the badge to Mr. Cordray, Mr. Forster stated, "she's trespassing.  I don't want her

in the store.  She needs to get out of here.  Get out.  Get out.  You're trespassing."  (Id. at 149.)

People were walking in and out of the store and looking at her.  (Id. at 149-150.)  Thereafter, Mr.

Cordray stated "you're trespassing.  Chris said he doesn't want you in the store."  (Id. at 152.)

On May 20, 2005, Plaintiff commenced the instant action in the Court of

Common Pleas of Philadelphia County, Pennsylvania, alleging defamation against Wal-Mart,

Chris Forster and Merl Cordray.  Specifically, she claimed that the following statements were defamatory:  (1) the statements made by Mr. Cordray on May 20, 2004 (Count I); (2) the statements made at the May 24, 2004 meeting in the store manager's office (Count II); and (3) the statements that plaintiff was trespassing made by Chris Forster and Merl Cordray on May 24, 2004 (Count III).  By order of the Common Pleas Court, dated April 4, 2006, summary judgment was granted in favor of Chris Forster and Merl Cordray, due to the failure of plaintiff to serve these individuals within the relevant statute of limitations.  Thereafter, on May 2, 2006, the case was removed to federal court pursuant to diversity jurisdiction under 28 U.S.C. § 1332.  On April 27, 2007, defendant filed the instant Motion for Summary Judgment.

## II.  STANDARD OF REVIEW FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle do a judgment as a matter of law."  FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). For there to be a "genuine" issue, a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc., 998 F.2d 1224, 1230 (3d Cir.1993).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light

most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S. Ct. 993 (1962)); <u>Tigg Corp. v. Dow Corning Corp.</u>, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  <u>Id.</u> at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  <u>Matsushita Elec.</u>, 475 U.S. at 586.  "There must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence merely colorable or not significantly probative, summary judgment should be granted.  <u>Arbruster v. Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir. 1994), <u>abrogated on other grounds</u>, <u>Showalter v. University of Pittsburgh Med. Center</u>, 190 F.3d 231 (3d Cir. 1999).

## III.  DISCUSSION

As noted above, the whole of Plaintiff's Complaint sounds in defamation.  To establish defamation under Pennsylvania law,[3] the plaintiff has the burden of proving, "when the

---

3.   Neither party disputes the application of Pennsylvania law to this case.

issue is properly raised:  (1) the defamatory character of the communication; (2) its publication

by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its

defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the

plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a

conditionally privileged occasion."  42 Pa. Cons. Stat. § 8343(a); Manno v. American General

Finance Co., 439 F. Supp. 2d 418, 431-432 (E.D. Pa. 2006).

        At the outset, "it is the court's duty to determine if the publication is capable of

the defamatory meaning ascribed to it by the party bringing suit."  Beverly Enters., Inc. v. Trump,

182 F.3d 183, 187 (3d Cir. 1999) (quoting MacElree v. Phil. Newspapers, Inc., 674 A.2d 1050,

1053 (Pa. 1996)); see also Lynch v. Borough of Ambler, Civ. A. No. 94-6401, 1996 WL 283643,

at *6 (E.D. Pa. May 29, 1996) ("Whether a statement can reasonably be construed as defamatory

is a question of law for the court to decide.").  If the court determines that the statement is not

capable of defamatory meaning, there is no basis to proceed to trial.  Savage v. Conn. Gen. Life

Ins. Co., Civ. A. No. 96-1709, 1997 WL 587343, at *9 (E.D. Pa. Sept. 11, 1997) (citing Maier v.

Maretti, 671 A.2d 701, 704 (Pa. Super. 1995)), aff'd, 162 F.3d 1151 (3d Cir. 1998).  On the other

hand, if the court finds that the statement is capable of defamatory meaning, then the jury must

decide if the statement was so understood by the listener.  U.S. Healthcare, Inc. v. Blue Cross of

Greater Phil., 898 F.2d 914, 923 (3d Cir. 1990).

        Defamation is a communication which "tends so to harm the reputation of another

as to lower him in the estimation of the community or to deter third persons from associating or

dealing with him."  Beverly Enters., 182 F.3d at 187 (quotations omitted).  In determining

whether a communication is defamatory, the court must view the statement 'in context' with an

eye toward 'the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir. 2001) (quoting Baker v. Lafayette, 532 A.2d 399, 402 (Pa. 1987)).  In the employment context, a communication is defamatory if it concerns the plaintiff's abilities to "perform her job" and "harm her trade or ability to become employed elsewhere."  Maier, 671 A.2d at 705-06.  In other words, a statement is actionable "if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession."  Id. at 704.

Defendant Wal-Mart now moves for summary judgment on the entirety of Plaintiff's Complaint arguing that Plaintiff has failed to set forth any statements that are capable of defamatory meaning.  In addition, with respect to Count II, Defendant claims that the statements were either absolutely or conditionally privileged and that Plaintiff has not set forth facts establishing abuse of privilege.  The Court addresses each count individually.

### A.      Count I - Statements by Merl Cordray on May 20, 2004

Count I of Plaintiff's Complaint challenges as defamatory the May 20, 2004 remarks of Merl Cordray, who allegedly accused Plaintiff of theft and/or misappropriation of his and Wal-Mart property.  Defendant argues that Mr. Cordray's statements are not capable of having defamatory meaning for two reasons.  First, it contends that, according to Plaintiff's own deposition testimony, she was never accused of theft or misappropriation, as Mr. Cordray was simply responding to her inquiry regarding why her papers had been rearranged.  Second, it asserts that, even if Mr. Cordray's remarks could be construed as an accusation of theft or

misappropriation, then they were at most an expression of opinion not actionable under Pennsylvania law.

Viewing Mr. Cordray's March 20, 2004 statements "in context" with an eye toward the effect the statements were fairly calculated to produce in the minds of the average persons among whom it was intended to circulate, the Court finds no merit to Defendant's first argument.  See  Remick, 238 F.3d at 261.  Cases applying Pennsylvania law have found repeatedly  that accusations of crime or wrongdoing in the employment context rise to the level of defamation.  For example, in Rockwell v. Allegheny Health, Educ. & Research Found., the defendant employer, met with plaintiff's two direct supervisors regarding a complaint that plaintiff filed with the Pennsylvania Human Relations Commission.  19 F. Supp. 2d 401, 404 (E.D. Pa. 1998).  During that meeting, the defendant indirectly implied that plaintiff was having an inappropriate affair with one of the supervisors and accused plaintiff of abusing his sick time and time off, despite the supervisors' insistence that plaintiff's time off was justified.  Id.  The court held that such statements were "accusatory, implying immoral and dishonest behavior," and thus were capable of defamatory meaning.  Id. at 405-06.

Likewise, in Agriss v. Roadway Express, Inc., the defendant company disseminated to plaintiff's supervisor and co-workers a statement that plaintiff had been opening company mail.  483 A.2d 456, 462 (Pa. Super. Ct. 1984).  The court held that the statement, although intended as a benign reprimand for a purported breach of company policy, was capable of defamatory meaning because it suggested that the plaintiff had committed a crime.  Id.

11

Finally, in <u>Krause v Security Search & Abstract Co. of Phila., Inc.</u>, the plaintiff employees alleged that their defendant employer defamed them "by advising co-employees in public that [plaintiffs] were liars and not to be trusted as they were allegedly obtaining company information and releasing it to former employees of the Company, including [a woman who] was suing the Company.  Civ. A. No. 96-595, 96-5742, 1997 WL 528081, at *9 (E.D. Pa. Aug. 21, 1997).  In addition, [defendant] advised numerous individuals that [plaintiffs were] stealing and extorting money from the Company."  <u>Id.</u> at *9.  The court found that such allegations were capable of defamatory meaning.  <u>Id.</u>

In the case at bar, this Court concludes that Mr. Cordray's statements are similarly capable of defamatory meaning.  Although plaintiff initiated the interaction with Mr. Cordray by asking why her papers had been disturbed, Mr. Cordray did far more than simply respond to her question.  (Valjet Dep. 93.)  After Plaintiff began picking up her papers, he came over and, while not expressly using the words theft or misappropriation, unequivocally insinuated that Plaintiff had taken a paper that belonged to him.  (<u>Id.</u> at 94-96).  These statements were fairly calculated to produce the impression, in the minds of the other individuals in the room, that Plaintiff was guilty of dishonest behavior.  Such statements went past the bounds of being merely embarrassing or objectionable and rose to the level of defamation.[4]

---

4.   The cases cited by defendant in support of its contrary argument are inapposite.  The statements challenged in those cases were merely offensive and did not suggest any immoral or dishonest behavior, or wrongdoing/crime.  <u>See</u> <u>Maier</u>, 671 A.2d at 704 (statement that suggested that plaintiff was vulgar, crude and grossly insubordinate, and indicated that plaintiff was intemperate, lacked integrity and self-control were not capable of defamatory meaning); <u>Parano v. O'Connor</u>, 641 A.2d 607, 609 (Pa. Super. Ct. 1994) (statements by purchaser that administrator was "uncooperative," "less than helpful," and "adversarial" were not statements capable of defamatory meaning); <u>Kryeski v. Schott Glass Techs.</u>, 626 A.2d 595, 601 (Pa. Super. Ct. 1993) (alleged statements by one employee to another that plaintiff was "crazy" made in response to plaintiff's accusations about defendant's affair and promotions was nothing more than a "vigorous epithet" not capable of defamatory meaning); <u>Gordon v. Lancaster Osteopathic Hosp. Ass'n.</u>,

(continued...)

12

In its alternative argument, Defendant contends that Mr. Cordray's statements were nothing more than an expression of pure opinion, based on disclosed facts, which is not actionable under Pennsylvania law. Defendant specifically claims that after first disclosing to Plaintiff a belief that a particular document was his, he simply asked how it had come into her possession.

It is true that "opinion without more does not create a cause of action in libel." Baker, 532 A.2d at 402; accord RESTATEMENT (SECOND) OF TORTS § 566 (1977). "A simple non-actionable expression of opinion occurs when a person expresses a comment as to another's conduct, qualifications or character after either stating the facts on which he bases his opinion or when both parties to the communication know the facts or assume their existence."[5] Rockwell, 19 F. Supp. 2d at 406. However, because such expressions of opinion may often imply an assertion of objective defamatory fact, such statements are actionable if the allegedly libeled party can show that the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion. Baker, 532 A.2d at 402. As more succinctly explained by the Third Circuit, "if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the

---

4.  (...continued)
489 A.2d 1364, 1369 (Pa. Super. Ct. 1985) (phrases "a vote of no confidence," "lack of trust in the reporting ability of [appellant]," "lack of confidence in [appellant's] work," and "[appellant's] attitude and performance over the past several years ... [indicates] ... a vote of 'no confidence'" included in a series of letters from doctors to Board of Directors of hospital regarding renewal of plaintiff's contract did not impute a charge of incompetency or unfitness).
            In this case, however, Mr. Cordray accused Plaintiff of possessing a paper that did not belong to her. Such statements clearly implied theft and went directly to plaintiff's moral character and fitness to perform her job, thereby damaging her reputation.

5.  As explained by the United States Supreme Court, "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Gertz v. Welch, 418 U.S. 323, 339-40, 94 S. Ct. 2997, 3006-07 (1974).

soundness of the opinion. In such circumstances, if the underlying facts are false, the Constitution does not protect the opinion." Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985).

The Court, in this case, again deems Defendant's argument unmeritorious . Mr. Cordray's statements could not reasonably be interpreted as an expression of his opinion, as they constituted a direct accusation of Plaintiff.  Further, his remarks undoubtedly implied the existence of multiple undisclosed facts.  A reasonable recipient of this communication could understand Mr. Cordray's statements to suggest that there was a document owned by Mr. Cordray that was currently in the possession of Plaintiff, that Plaintiff had knowingly taken that document from Mr. Cordray without his knowledge or consent, that the document had some sensitive or confidential information which Plaintiff had reason to want to possess and that Mr. Cordray had a basis for believing that Plaintiff intentionally stole from him.  Such underlying facts are, in and of themselves, potentially defamatory.  As Defendant has produced no evidence to establish that such facts were true and known to all of the individuals present in the room at the time the statements were made, it has not proven that the statements were pure opinion. See Rockwell, 19 F. Supp.2d at 406 (Defendant statements that (a) plaintiff's supervisor's "libido was up, and she wanted to act on it,"and (b) plaintiff had a pattern of taking off Mondays and Fridays to abuse his vacation time were not founded on disclosed facts and implied undisclosed immoral or dishonest activity by the plaintiff); Green v. Minzer, 692 A.2d 169, 174-175 (Pa. Super. Ct. 1997) (factual statements declaring plaintiff's activity as being illegal surpassed mere expressions of opinion and implied the existence of undisclosed facts).  As an issue of material

14

fact exists as to whether the statements were understood by their recipients as defamatory, the Court rejects this argument.

### B.   Count II - Statements by Chris Forster and Merl Cordray at May 24, 2004 Disciplinary Meeting

Plaintiff's second count alleges that the statements by Mr. Cordray and Mr. Forster at the May 24, 2004 disciplinary meeting were defamatory.  These statements are as follows:

> Merl Cordray:  "it's dishonest to take . . ."
>
> Chris Forster:  "Cristal, you have a choice.  Are you going to quit?"
>
> Chris Forster:  "Isn't this the paper?"
>
> Chris Forster:  "What are you going to do?  You're going to have a D-day then. You're going to have a D-day.  Are you going to quit?  Are you going to quit? Huh, huh?
>
> Chris Forster:  "Don't let the door hit you from behind."

(Valjet Dep., 137-138.)  Defendant counters that these statements were likewise not capable of defamatory meaning and, in any event, were subject to an absolute or conditional privilege.

At first blush, the Court is inclined not to find any of these statements subject to any defamatory meaning.  Mr. Cordray's statement consisted of only a partial sentence with no obvious interpretation.  As to Mr. Forster, he never specifically accused plaintiff of theft and never explicitly said anything to generally injure plaintiff's reputation in her profession.  See Lynch v. Borough of Ambler, Civ. A. No. 94-6401, 1996 WL 283643, at *5 (E.D. Pa. May 29,

1996) (concluding that a statement informing Plaintiff that she was suspended without pay, standing alone, cannot reasonably be construed as defamatory).

Nonetheless, considered in context, we hold that Mr. Forster's statements were capable of defamatory meaning and that a genuine issue of material fact exists as to whether the recipients of the statements would have deemed them defamatory.  The nature of the intended audience is a critical factor in considering whether a communication is capable of defamatory meaning.  Momah v. Albert Einstein Med. Ctr., 978 F. Supp. 621, 634 (E.D. Pa. 1997), aff'd, 229 F.3d 1138 (3d Cir. 2000).  "If the allegedly defamatory statements are susceptible to several interpretations, some of which are benign, some of which are not, it is for the jury to decide how the statement is likely to be interpreted by the intended audience."  Smyth v. Barnes, Civ. A. NO. 94-930, 1995 WL 576935, at *10  (M.D. Pa. Sept. 25, 1995).

The audience for Mr. Cordray's and Mr. Forster's statements consisted of the store manager and people manager of the South Philadelphia Wal-Mart store, both direct supervisors of Plaintiff's and both of whom had prior knowledge of Mr. Cordray's allegations that Plaintiff had taken his paper.  While no express accusation of theft was made, there was a clear implication that she had engaged in such acts.  Immediately following a discussion by Mr. Riif of an investigation into the events, Mr. Forster intervened to tell Plaintiff she had a choice and to ask if she was going to quit, directly suggesting that she had committed misconduct by stealing.  When she asked what she did wrong, he responded, "Isn't this the paper?," referring to the item she had allegedly taken.  When she responded that she had handled millions of dollars in the store and protested her characterization as "dishonest," Mr. Forster simply indicated that she was going to have a "D-day," which, as characterized by plaintiff, was reserved for cases of

severe insubordination.  Considering these facts as a whole, the Court finds it to be a reasonable interpretation that Mr. Forster was directly accusing Plaintiff of theft and was disciplining her on those grounds.  As published to her supervisors, these statements had the effect of impugning her reputation.  See Rockwell, 19 F. Supp.2d at 405-06 (statements indirectly suggesting that plaintiff had an inappropriate sexual relationship and abused time off that were published to plaintiff's direct supervisors were capable of defamatory meaning because the supervisors would have understood their defamatory meaning).

The Court's inquiry, however, does not end at this juncture.  Defendant argues that these statements, if defamatory, were privileged.  Liability for publication of a defamatory matter may be defeated by a privilege to publish it.  Momah, 978 F. Supp. 671.   A conditional privilege may apply when a communication is made upon a proper occasion, for a proper motive, in a proper manner and based upon reasonable cause.  Furillo v. Dana Corp. Parish Div., 866 F. Supp. 842, 848 (E.D. Pa. 1994) (citing Rutherford v. Presbyterian-Univ. Hosp., 612 A.2d 500 (Pa. Super. Ct. 1992)).  The conditional privilege applies to communications among management-level personnel concerning an employee's job performance, discipline and termination.  Id.[6]

---

6.   Defendant also argues, albeit somewhat vaguely, that an absolute privilege applies.  "An employer has an absolute privilege to publish defamatory matters in notices of employee termination, and such publication communicated to plaintiff and relevant supervisory personnel is not capable of defamatory meaning."  Furillo, 866 F. Supp. at 847-48 (internal citations omitted).  The purpose of the absolute privilege is to encourage the employer's communication to the employee of the reasons for discharge by eliminating the risk that the employer will possibly be subject to liability for defamation.  Barclay v. Keystone Shipping Co., 128 F. Supp.2d 237, 248, n.14 (E.D. Pa. 2001).  Likewise, the absolute privilege pertains to warning letters placed in a personnel file.  Agriss, 483 A.2d at 464.

In this case, the application of the absolute privilege remains unclear.  Defendant concedes the May 24, 2004 meeting "occurred within the context of employment related investigatory or disciplinary meeting." (Def. Br. 12.)  Since the meeting did not constitute a termination or warning, the absolute privilege is not unequivocally applicable.  See Barclay, 128 F. Supp.2d at 248 n.14 (communications made in the context of an

(continued...)

Once a conditional privilege attaches, liability does not reach the covered individuals unless that privilege has been abused. Id. at § 8343(a)(7). Abuse of the privilege can be evidenced by proof that the publication was: (1) actuated by malice or negligence; (2) made for a purpose other than that for which the privilege is given; (3) made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose of the privilege. Elia v. Erie Ins. Exch., 634 A.2d 657, 661 (Pa. Super. Ct. 1993). Although the application of a conditional privilege is a question of law, whether that privilege has been abused is a question of fact. Agriss, 483 A.2d at 463. Nevertheless, in order to defeat a motion for summary judgment, a plaintiff must set forth some evidence of abuse of privilege. Barclay,128 F. Supp. 2d at 248. Compare Pulchaski, 161 F. Supp.2d at 410 n.8 (granting summary judgment for defendant who made defamatory statement where statement was conditionally privileged and plaintiff failed to present competent evidence of abuse of privilege); Daywalt v. Montgomery Hosp., 573 A.2d 1116, 1119 (Pa. Super. Ct. 1990) (finding, on summary judgment review, that plaintiff failed to establish abuse of privilege where she alleged that defendants "wickedly intended" to cause her harm, but never pointed to evidence of spite, malice or improper purpose), with Rockwell, 19 F. Supp. 2d at 408-09 (finding conditional privilege inapplicable where defendant's statements were not "consistent with the interest related to a conditional privilege" and plaintiff had sufficient evidence that defendant had motive to harm his professional reputation); Smyth, 1995 WL 576935, at *15 (finding evidence showing that little to no

6. (...continued)
investigation rather than a termination were not covered by the absolute privilege).

18

investigation was conducted before conditionally privileged statements were made and that speaker may have acted out of malice, which precluded summary judgment on defamation case).

As Defendant correctly argues, the statements by Mr. Cordray at the May 24, 2004 meeting were conditionally privileged.  The communications were all made as part of a meeting among various management-level personnel regarding an investigation into Plaintiff's work performance.  Each of those in attendance had a legitimate reason for their presence. Plaintiff's allegation that the meeting was to "accuse, harass and bait Plaintiff to quit her job," is unfounded and based on no citations to any evidence of record.  (Pl's. Br. 17.)

In an alternate effort to defeat this privilege, Plaintiff asserts that the defamatory statements were actuated by malice and were published to those who did not have any proper purpose for hearing them.  Specifically, she contends that in March 2004, while working at a different Wal-Mart store, she had registered a complaint with a different management official regarding a different employee.  (Id. at 3 and Ex. B.)  The management of the South Philadelphia store, according to her brief, "must be imputed" to know of her prior complaint and fear that she might make similar complaints at her current store, thus creating a motive for her termination. (Id. at 3.)  On May 20, 2004, she observed Mr. Cordray engaging in some improprieties by improperly fraternizing with and giving his password to Ms. Muhammed and Ms. Noah.  (Id. at 13.)  Plaintiff was later told that these latter two individuals had "set her up" as a result of her observations.  Further, they were present in the store manager's office just before the May 24, 2004 meeting.  Considering the totality of these facts, Plaintiff argues that it is a "reasonable inference" that Ms. Noah and Ms. Muhammed collaborated with Mr. Cordray, Ms. Ferm and Mr. Forster to falsely accuse her so that she could not complain.  (Id. at 13.)  Finally, she claims that

Mr. Forster acted with malice and/or ignored patent evidence of the truth that she was innocent of the charges.  (Id. at 17.)

Notwithstanding the complexity of her theory, however, Plaintiff fails to meet her burden at the summary judgment stage of citing to probative evidence in support.  Nothing in the record permits the Court to ascribe possible malice or negligent disregard of the truth to Mr. Forster - the maker of the defamatory statements.  The Court cannot "reasonably impute" to Mr. Cordray and Mr. Forster knowledge of her complaints at the prior Wal-Mart store.  Likewise, while Plaintiff offers her deposition for proof that she was told of being "set up" by Ms. Muhammed and Ms. Noah, the record is devoid of any colorable showing of collaboration between these individuals and upper management.  Moreover, Plaintiff points to no evidence that the investigation into Mr. Cordray's accusations established that she was free from fault, so as to make Mr. Forster's accusations reckless.  Finally, Plaintiff never alleges that Mr. Forster demonstrated any personal or professional animus towards her prior to the events of May 24, 2004.  As Plaintiff has presented no colorable evidence of abuse of privilege, the Court grants summary judgment on Count II of the Complaint.

### C.    Count III - May 24, 2004 Allegations of Trespassing

Plaintiff's third and final Count in her Complaint alleges that she was defamed by Mr. Cordray's and Mr. Forster's accusations that she was trespassing and that she needed to "get out" of the store.  (Valjet Dep. at 149-150).  Defendant again claims that this Count should be dismissed due to the fact that the statements simply constituted notice to Plaintiff to leave the store and did not accuse her of any wrongdoing.  Specifically, it contends that the remarks at

issue simply constituted notice to Plaintiff that if she did not leave the property, she could be subject to a charge of trespass.

The Court rejects Defendant's argument and finds that the statements were indeed capable of defamatory meaning.  "A statement constitutes slander per se as an accusation of criminality when it charges either directly or indirectly the commission of a specific offense punishable by imprisonment."  Clemente v. Espinosa, 749 F. Supp. 672, 679 (E.D. Pa. 1990) (citing Burns v. Supermarkets Gen. Corp., 615 F. Supp. 154, 157 (E.D. Pa. 1985); RESTATEMENT (SECOND) OF TORTS § 571 (1977)).  See also Pennoyer v. Marriott Hotel Services, 324 F. Supp.2d 614, 616-618 (E.D. Pa. 2004) (hotel security officer's accusation that plaintiff was trespassing and committed theft so that other guests could hear was capable of defamatory meaning).

In the instant matter, after Plaintiff left the meeting, she began to exit the store of her own volition; no manager or supervisor requested that she do so.  When she turned around to hand her badge to Mr. Cordray, Mr. Forster did not simply give her notice that he wanted her to leave and that, if she did not, she would be trespassing.  Instead, he stated, in a voice audible to other employees and patrons of Wal-Mart, that Plaintiff was actually trespassing at that moment. Recipients of that statement could have reasonably believed that she was committing a crime. Such an accusation survives summary judgment review.

IV.   CONCLUSION

For all of the foregoing reasons, the Court finds that the statements challenged in all three Counts of Plaintiff's Complaint are capable of defamatory meaning.  Further, we deem

the statements in Count II to have been made under a conditional privilege, which was not

abused.  Accordingly, we grant summary judgment on Count II and deny summary judgment on

Counts I and III.[7]

An order follows.

_____

7.    In its Motion, Defendant also alleges that the statements made by Ms. Ferm and Mr. Cordray during one-on-one meetings with Plaintiff on May 20, 2004 do not support a defamation claim.  Plaintiff, however, only raises the facts of those meetings and Mr. Cordray's taking of her keys as evidence of publication of Mr. Cordray's earlier statements.  Her Complaint does not contend that the statements made by Ms. Ferm or Mr. Cordray at those meetings were defamatory.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


CRISTAL VALJET,                              :          CIVIL ACTION

               Plaintiff,          :

         v.                        :

                            :          NO.  06-01842

WAL-MART,                                    :

               Defendant.          :


**ORDER**

     **AND NOW**, this 11th day of December 2007, upon consideration of Defendant's

Motion for Summary Judgment (Docket No. 15), the Response of Plaintiff (Docket No. 21) and

Defendant's Reply Brief (Docket No. 24), it is hereby **ORDERED** as follows:

     1.     Defendant's Motion as to Counts I and III of the Complaint is **DENIED**;

     2.     Defendant's Motion as to Count II of the Complaint is **GRANTED**; and

     3.     **JUDGMENT** is **ENTERED** in favor of Defendant and against Plaintiff as

          to Count II of the Complaint.


                         BY THE COURT:


                          *s/ Ronald L. Buckwalter, S. J.*
                          RONALD L. BUCKWALTER, S. J.